Jones, J.
(dissenting in part). I agree, and for the reasons stated by the majority, that these two cases should be addressed on their merits, notwithstanding that the deaths of the two patients have rendered moot the specific legal issues tendered. Similarly, I agree with the conclusion reached by the majority in Matter of Eichner. I find the address of the majority in Matter of Storar, however, inadequate to what 1 conceive to be the jurisprudential responsibility of our court in this case; I also differ with the result they reach.
I.
I do not question that Judge Wachtler’s opinion constitutes an accurate and clear statement of the highest common factors on which all members of the court are in agreement. In the normal case, if such an exposition were sufficient to dispose of the particular appeal, I would be reluctant to add a separate writing which would serve only to reflect an individual preference as to analysis or expression. These are not run-of-the-mill cases, however; they pose issues for judicial resolution in a field of the most far-reaching and solemn implications concerning which we do not yet have the benefit of any legislative enactment in New York or the guidance of any extensive body of decisional law. At the same time, while there is compelling reason to believe that the problems of the nature presented in these two cases have been of significant incidence in our society for many years, only relatively recently have they been identified for judicial attention. There are, however, *384 abundant manifestations of both the breadth and depth of interest and concern on the part of the medical profession, theologians, ethicists, moralists, sociologists and criminologists, as well as of the public at large.[1] In this circumstance I am persuaded that we have a special responsibility to express our views with respect to judicial participation in the resolution of individual cases, even if to do so results in unveiling differences in points of view among us or reveals doubt as to the extent of the authority or role of our courts in such cases. Either may provide the initiative for or underscore the desirability of legislative address and action.
The generic issue presented is not of broad scope. We all recognize the right Of a competent adult to make decisions with respect to his own medical or surgical care even if the consequence of the particular decision be to hasten death. The question before us is whether, and under what circumstances, a surrogate decision can be made on behalf of the patient when he is incompetent to make it himself, where he has been diagnosed as incurably ill, and where the decision relates to the withholding or withdrawal of extraordinary life support medical procedures. The question poses the problem of judicial involvement in passive euthanasia (sometimes called “dysthanasia”) — the deliberate withholding or withdrawal of available clinical means for the prolongation of the life of a patient for whom there is little or no hope of recovery or survival.[2] Treating as the subject does with irreversible decisions affecting life and death, we approach, and even may be thought by some *385 to trespass on, the domain of Providence. Few areas of judicial activity present such awesome questions or demand greater judicial wisdom and restraint.
I identify two aspects of the problem so fundamental as to call for exposition by this court, neither of which receives express attention in the writing of the majority. The first is explicit acknowledgment that the problem is one which the judicial system is unsuited and ill-equipped to solve and which should not usually be made the subject of judicial attention. The lapse of time necessarily consumed in appellate review before there can be a final judicial determination will almost always be unacceptable and makes recourse to judicial proceedings impractical. The methodology and the techniques of our classic adversary system are not best suited to the resolution of the issues presented. The courts can claim no particular competence to reach the difficult ultimate decision, depending as it necessarily must not only on medical data, but on theological tenets and perceptions of human values which defy classification and calibration.
There is reliable information that for many years physicians and members of patients’ families, often in consultation with religious counselors, have in actuality been making decisions to withhold or to withdraw life support procedures from incurably ill patients incapable of making the critical decisions for themselves.[3] While, of course, *386 there can be no categorical assurance that there have been no erroneous decisions thus reached, or even that in isolated instances death has not been unjustifiably hastened for unacceptable motives, at the same time there is no empirical evidence that either society or its individual members have suffered significantly in consequence of the absence of active judicial oversight. There is no indication that the medical profession whose members are most closely aware of current practices senses the need for or desires judicial intervention.
For all the foregoing reasons I would explicitly affirm the proposition that judicial approval is not required for discontinuance of life support procedures in situations such as those now before us and that neither civil nor criminal liability attaches simply by reason of the absence of a court order of authorization.
As to the second aspect, I nevertheless recognize that there will be occasions in which the courts will have thrust on them cases such as the two now before us. It is not difficult to anticipate instances in which for one or more of a variety of reasons a member of the patient’s family or a close friend might desire to seek formal judicial approval of a proposal to withhold or to withdraw a particular extraordinary life support procedure. I would therefore explicitly affirm the authority of our courts, in proper cases and in proceedings appropriately instituted, to grant au *387 thorization for withholding or withdrawal of extraordinary life support medical procedures, notwithstanding the absence of evidence of an anticipatory expression of the attitude or wishes of the particular patient (as was present and the critical factor in the Eichner case).
Thus I would have hoped that our court in the appeals now before us, would expressly have recognized the availability of, but not the necessity for, judicial approval of surrogate decisions in cases such as these. The fact that there is no such recognition serves to underscore the high desirability, here and elsewhere expressed, of legislative attention and action.
Similarly, to the extent that an impelling reason for continuing to entertain cases which have become individually moot is to identify and discuss controlling principles and to set standards and provide guidance, not only for the lower courts which can be expected to confront similar cases, but also (and of greater practical significance) to the medical care providers who nearly daily are confronted with individual instances in which consideration is being given to withdrawal of life support procedures, our writings in these cases must fall short of what surely would have been desirable had it been possible to reach a broader consensus. Other than indicating an unreadiness to approve the detailed procedures laid down by the Appellate Division in Matter of Eichner the court will have provided little if any procedural guidance either to the lower courts in our State — for instance, as to who has standing to bring such proceedings and what must be shown to warrant judicial authorization for the relief sought — or to the medical care providers as to how or whether they may properly and safely proceed in the absence of express judicial authorization. I would much have preferred writings that would have provided more constructive direction both for the courts, to which will surely be presented, and perhaps in increasing volume, applications of the character now before us, and for hospitals and physicians, on whom the burden of responsibility for daily decisions so often falls. Absent such enabling consensus however, I perceive no useful purpose to be served by one member of the court presuming *388 to express his views on what are procedural matters (as distinguished from the expression which I have felt compelled to make on two substantive issues).
II.
With respect to the disposition of the appeals in these two cases: as stated, I would concur in result in Matter of Eichner; in Storar I would modify the order of the Appellate Division to the extent of dismissing the petition of Charles S. Soper as Acting Director of the Newark Developmental Center, and, as so modified, affirm. The dismissal would be premised on lack of standing of the hospital (or its director on behalf of the hospital) as a medical care provider to have instituted the proceeding seeking judicial authorization to continue blood transfusions against the wishes of Dorothy Storar, the patient’s mother, guardian and committee. Medical care providers have at best only-a tangential interest in the outcome of the litigation and can have no legitimate individual stake in the institution (or continuation) or the discontinuance of the medical procedure.[4] Cases may arise in which it is appropriate to name the provider as a party defendant for the purpose of giving practical effect to the court’s decision. In matters such as these it has been the practice in the . past to recognize the standing of a public or quasi-public official to institute judicial proceedings (e.g., see cases cited majority opn, pp 380-381). Until today, however, this court has never recognized the standing of a medical care provider to seek authorization to continue medical care against the wishes of the patient or one who stands in his stead. Additionally I am apprehensive that to accord standing to medical care providers to seek authorization for continuation of extraordinary life support procedures in cases such as this might foster a perception that obtaining judicial approval should be the normal expectation (rather than a procedure to be resorted to only in extraordinary circumstances) and thus *389 lead to an increase in the institution of such proceedings, in some instances as anticipatory defensive strategy with respect to possible future claims for malpractice. Nor would I know what significance, if any, to ascribe to the circumstance that extraordinary medical procedures in particular now often involve a very heavy economic cost which might, at least in some instances, have a bearing on the provider’s incentive to institute or continue such care (as well, on the other side of the equation, as possibly to lead dependent family members to oppose expensive treatment). I would, however, recognize the standing of a member of the family such as John Storar’s mother, or a close friend as in Eichner, to institute a judicial proceeding for authorization to withhold or to withdraw life support measures.
As to the merits in Storar, I find no sufficient ground, as a matter of law, to reverse the determination made by Supreme Court, now affirmed at the Appellate Division, and I perceive no other predicate on which the court can disturb the order of the Appellate Division; it cannot consider the matter de novo or make new determinations of fact except where the evidence in the record is so overwhelming as to require a particular determination as a matter of law.
While there was evidence, to which the majority refers, that the discontinuation of blood transfusions would have “eventually” led to John Storar’s death (and inferentially perhaps before death would otherwise have been caused by his cancer of the bladder), no finding was made as to what extension of life would attend the continuation of transfusions. Supreme Court made the ambiguous finding, undisturbed by the Appellate Division, that “Storar has a life expectancy of from two to six months regardless of whether the blood transfusions are continued or not”.[5] Simi *390 larly, although evidence was introduced that following transfusions Storar had more energy and was able to resume most of his usual, limited activities, the courts below made no finding that continued transfusions would improve the quality of his life or, if so, in what respects or to what extent. In the absence of factual determintations with respect to these matters (and in my view the evidence in the record is not sufficient to justify this court’s now supplying such findings as a matter of law), I cannot conclude as a matter of law that the courts below erred in authorizing discontinuance of the blood transfusions in the light of the factual determinations which the courts did make, to wit:
That John had cancer of the bladder which was both inoperable and incurable, with a life expectancy of from two to six months; that one who has cancer of the bladder suffers severe pain and the need for medication increases as the cancer spreads; that John had been in frequent pain and as his pain had increased his need for medication had also increased;
That the blood transfusions were painful although not excessively so; that because of John’s apprehension and manifest dislike of the procedure the nurse had been giving him a shot approximately one hour before the transfusion; that he submitted to the blood transfusions reluctantly and because of the force that compelled him to submit; that recently he had had to be physically restrained and to have his arm tied down to prevent him from pulling out the needle used for the transfusion; that in contrast to his behavior prior to the commencement of the transfusions, he thereafter ventured outside his room infrequently; that he had appeared to be progressively more uncomfortable during the procedures; that as a result of the transfusions there was frequent clotting in his urine which made urination more painful; that the blood contributed to increased *391 levels of sensitivity to the pain he was experiencing and contributed to his discomfort;
That the transfusions did not serve to reduce John’s pain or to make him more comfortable; that the blood forced on him did not serve a curative purpose or offer a reasonable hope of benefit;
That if the transfusions were stopped John would suffer no additional pain, his discomfort would not increase, and indeed cessation might serve to make him less aware of the physical sensations he was experiencing and even lead to a subsiding of the bleeding from his bladder lesions;
That in the circumstances the blood transfusions were extraordinary treatments;
That because of his lifelong profound mental retardation John was incompetent to refuse or consent to the continuation of the blood transfusions or to make a reasoned choice as to his own wishes or best interests;
That his mother over his lifetime had come to know and sense his wants and needs and was acutely sensitive to his best interests; that she had provided more love, personal care, and affection for John than any other person or institution, and was closer to feeling what John was feeling than anyone else; that his best interests were of crucial importance to her;
That in his mother’s opinion it would have been in John’s best interests to discontinue the transfusions, and she believed that he would wish to have them stopped.
No one suggests that there is not sufficient evidence in this record to support each of these factual findings.
I would hold that the courts below had power to authorize the withdrawal of extraordinary life support measures and that, in the circumstances of this case, there was no error of law when the courts below exercised that power to grant Mrs. Storar’s cross application to discontinue blood transfusions for her son, John.

. (See, e.g., Kutner, Euthanasia: Due Process For Death with Dignity; The Living Will, 54 Ind LJ 201; Ufford, Brain Death/Termination of Heroic Efforts to Save Life — Who Decides?, 19 Washburn LJ 225; Note, Informed Consent and the Dying Patient, 83 Yale LJ 1632; Survey, Euthanasia: Criminal, Tort, Constitutional and Legislative Considerations, 48 Notre Dame Lawyer 1202; Fletcher, Ethics and Euthanasia, 73 Am J Nursing 670; Williamson, Prolongation of Life or Prolonging the Act of Dying?, 202 JAMA 162; 3 Houts, Courtroom Medicine, § 1.06, p 1-53; Pope Pius XII, Prolongation of Life, 4 AM Q Papel Doctrine 393; Burt, Taking Care of Strangers: The Rule of Law in Doctor-Patient Relations.)

. Because “euthanasia” can have two meanings, to avoid any possible misunderstanding I explicitly disclaim any intention, expressly or by implication, to invite consideration of “active” euthanasia — the deliberate use of a life shortening agent for the termination of life.

. (Levisohn, Voluntary Mercy Deaths, 8 J For Med 57, 68 [Levisohn conducted a survey of the Chicago Medical Convention which revealed that 61% of the physicians present believed that euthanasia was being practiced by members of the profession] ; Euthanasia Questions Stir New Debate, Med World News, Sept. 14, 1973, p 75 [87% of respondents to a poll of the Association of American Physicians reported they approved of passive euthanasia] ; see, also, e.g., Harrison’s Principles of Internal Medicine [9th ed], pp 6-7; Survey, Euthanasia: Criminal, Tort, Constitutional and Legislative Considerations, 48 Notre Dame Lawyer 1202, 1213; Wilkes, When Do We Have The Right To Die?, Life, Jan. 14, 1972, p 48; Medical Ethics: The Right To Survival, Hearings Before The Subcommittee On Health Of The Committee On Labor & Public Welfare, 93 Cong, 2d Sess 9 [1979].)
Luis Kutner, Chief Justice of the World Court of Human Rights, has recently written that doctors’ attitudes toward euthanasia have changed: “Suprisingly, in a survey reported in mid-1974, 79% of physicians responding expressed some belief in the right of the patient to have a say about his death. The subject of death has also become an important part of medical school *386 curriculum, whereas in the past there was a tendency to neglect it in other than a strictly clinical sense. Moreover, at its annual conference, the austere American Medical Association formally adopted the following policy statement: ‘The cessation of the employment of extraordinary means to prolong the life of the body where there is irrefutable evidence that biological death is imminent is the decision of the patient and-or his immediate family * * This provided doctors with a sanction for what many had actually been doing for some time, since the practice of turning off machines, for example, to allow death to come to a patient whom only the machine is keeping alive is a fairly common practice for hospitals. As a matter of fact, doctors at the Yale University School of Medicine willingly acknowledged that they had quietly allowed 43 severly deformed infants to die by withholding treatment after the parents agreed there was little chance for ‘meaningful life.’ The doctors disclosed this in hopes of breaking down ‘a major social taboo.’ ” (Kutner, Euthanasia: Due Process For Death With Dignity; The Living Will, 54 Ind LJ 201, 223.)

. Nothing in article 33 of the Mental Hygiene Law or in the administrative regulations of the commissioner (14 NYCRR 27.9 [c]) (assuming the power of the commissioner by promulgation of regulation to confer standing) conferred standing on the acting director of the developmental center to institute the present proceeding.

. Indeed, in one perspective this case might be said to fall in a classification quite distinct from that in Eichner, namely, one concerning the authority of the courts to authorize a surrogate determination on behalf of an incompetent adult who is incurably ill, but lacks capacity to make such a determination himself, to discontinue an extraordinary life support medical procedure which is not necessarily prolonging his life, i.e., a decision relating to the quality but not the duration of life of a patient facing inescapably *390 accelerated death. The courts below, and now the majority in our court, however, have analogized this case to that of Eichner, posing the question of extending (“at best * * * only a short extension of life”, as the Appellate Division stated it [78 AD2d 1013]) the life of an incurably ill patient.